IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kathleen G. Sheehan Vello            :
                                    :
          v.                   : No. 526 C.D. 2024
                                    : Argued: February 4, 2025
Daniel DeMarco,                :
             Appellant      :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE STACY WALLACE, Judge (P.)
                 HONORABLE MATTHEW S. WOLF, Judge

OPINION
BY JUDGE WALLACE                            FILED: July 10, 2025

Daniel DeMarco (DeMarco) appeals from the order dated April 18, 2024, by the Court of Common Pleas of Allegheny County (Common Pleas), which denied his motion for judgment on the pleadings in the lawsuit filed against him by Kathleen G. Sheehan Vello (Vello), alleging defamation and false light invasion of privacy. DeMarco, who serves as the President of the Ross Township (Township) Board of Commissioners, argues he is entitled to judgment under the doctrines of high public official immunity and judicial or quasi-judicial immunity. After careful review, we affirm.

## BACKGROUND

We take the alleged facts from Vello's complaint, admissions in her reply to DeMarco's new matter, and her brief opposing DeMarco's motion for judgment on the pleadings. Vello is a licensed attorney who resides with her husband, Matthew Vello (collectively, the Vellos), in the Township. The Vellos live adjacent to a parcel

(Transvaal parcel) that was previously owned wholly or in part by Richard Quigley, Jr. (Quigley). Quigley used the Transvaal parcel to operate a landscaping and supply contracting business. In approximately 2019, Quigley began land clearing, grading, and unpermitted excavation activity on the Transvaal parcel, resulting in "excessive disturbance of dirt, dumping of unknown solid waste and debris, landslides, and raw sewage contamination of the stream that runs through the Vello parcel." Reproduced Record (R.R.) at 7a-8a. He began using the Transvaal parcel as an unpermitted solid waste disposal facility in approximately 2020. Quigley placed unpermitted shipping containers on the Transvaal parcel and operated a tree-cutting service, which caused excessive noise.

Because of these activities, the Township cited Quigley for violating the local zoning ordinances. Quigley applied for variances, and the case proceeded before the Ross Township Zoning Hearing Board (Board). The Vellos and other community members opposed Quigley's applications before the Board, which ultimately denied the requested variances on May 11, 2022. Quigley appealed to Common Pleas but later discontinued his appeal. In August 2022, Quigley began moving his business operations to a different parcel less than one quarter of a mile away (Bascom parcel). Quigley leased, rather than owned, the Bascom parcel. The Township once again cited Quigley for violating the zoning ordinances because of shipping containers he placed on the Bascom parcel. Quigley applied for variances, and Vello and others opposed Quigley's applications at a Board meeting on February 8, 2023. The Board tabled Quigley's applications pending a site visit and scheduled the case to continue at a meeting on March 8, 2023. Quigley died one day before the meeting, on March 7, 2023.

Despite Quigley's death, the Board "untabled" his applications for variances at its March 8, 2023 meeting. R.R. at 395a. According to a transcript of the meeting, Quigley's uncle, Kevin Quigley, stated his family intended to continue pursuing the variances. The Board's solicitor explained the family would need to file amended applications on behalf of Quigley's estate. The solicitor also explained the owner of the Bascom parcel would need to lease it to the family. The Board swore in Kevin Quigley, who revealed his nephew committed suicide and blamed the Vellos for the death. The Board then took testimony via teleconference from one of the owners of the Bascom parcel, Christopher Ketterer, who explained he gave permission for the requested variances and intended to work with the family and amend the lease so the applications could proceed.

The Board asked if anyone else wished to speak regarding the matter, while cautioning it would not tolerate repetitious testimony or "out of line" behavior and was soliciting testimony "specifically to the variance . . . . It's not a credibility fight between folks that is a result of bad feelings generally towards each other." R.R. at 406a. The Board swore in DeMarco, who testified as follows:

> [DeMarco]: Mr. Chairman, this relates to ZHB-2-23. In almost 20 years if service -- or 24 years -- I'm sorry, 24 years of service as an elected official, I have never witnessed the amount of misinformation, false innuendo and lack of respect and knowledge of procedural due process involving an issue to be ruled upon by the appropriate decision[-]making bodies of the Township . . . .
>
> In the United States, every individual or entity has a right to ownership and the use of private property. However, the government can regulate the use of private property to protect the health, safety and welfare of the citizens within the borders of its jurisdiction.
>
> . . . Quigley had a right to use the property for his business, which he owned. One of the primary duties of this governmental body is to determine what, if any, violations of regulations set forth in the Zoning

3

Ordinances of [the] Township exist regarding legal use -- legal use of this property.

The law also provides for exceptions more commonly known as variances. And he, like any other individual or entity, was entitled to be here this evening to convince this body that a legal basis existed for variances.

The individuals employed by the Township . . . know the law and had followed all the laws as it related to this issue. Any accusations of nefarious activity by employees and . . . Quigley regarding the use of the property and the regulation of the same are outrageous and baseless.

Again, if any regulation is violated, this body will make that determination. Additionally, any alleged error in such a determination can be further reviewed by the courts of the Commonwealth of Pennsylvania.

What is frightening to me in this situation is that respect for the law and in particular knowledge of the law and in particular an individual who purports to be or is apparently a licensed attorney in Pennsylvania and the right to an individual to legal use of private property is of no concern.

Most bothersome is that many people believe they have such rights. But because they simply do not like the use of another's property, that individual should summarily be prohibited from the use of the property. This flies in the face of the constitutional right that everyone is afforded equal protection of the laws.

. . . Quigley unfortunately was driven into a state of hopelessness because of the disgraceful lack of respect for the Constitution and the laws of this Commonwealth. And this lack of respect is only getting worse. It's disgusting. I'm fed up with it. I'm fed up with people like [the] Vello[s] and others. I'm fed up with it. I'm tired of it. It's ridiculous.

[Board Chairman]: Order. Please.

[DeMarco]: I ask that everyone pray for . . . Quigley and his family tonight. His untimely and unnecessary death is a devastating and tragic loss. And I know that at this moment it's not a priority, but at some point pray that our great experiment of democracy will

4

continue. Because, unfortunately, on a daily basis and in this situation with the people who have acted so outrageously -- unreasonably outrageous and so on and so forth, there are many in this country that have a desire to see that experiment fail. Thank you.

*Id.* at 407a-09a.

Vello attempted to testify immediately after DeMarco, but the Board directed her to sit because she "spoke at the last meeting." R.R. at 410a. What happened next is difficult to decipher, although the transcript indicates the meeting broke down into "[s]houting from [the] audience" and repeated pleas for order from the Board. *Id.* In her complaint, Vello alleged DeMarco "raised his voice loudly and gestured wildly" at the Vellos, which "had the effect of whipping the crowd . . . into a frenzy," resulting in threats against the Vellos. *Id.* at 14a. Ultimately, the Board confirmed it would not allow Vello to testify again until "some other time" and tabled Quigley's applications for variances. *Id.* at 411a-14a. Board member Tara Howey (Howey) explained:

> [Howey]: It's not imperative tonight. . . . Quigley is gone. The estate will take over the property. At that time there will be discussion regarding the variances. And if you're here, you can speak then for five minutes or less. But you have had more than one opportunity to speak on this issue.
>
> No one is really discussing the issue. Actually, we're paying homage to . . . Quigley and his family and explaining to them the proper procedure for them to move forward with this, as [Kevin Quigley] extended that they are interested in going forward with the business.
>
> So at this point I think we can table it, members; and we can let the family go home, [and] be together.

*Id.* at 411a-12a.

Vello filed her complaint against DeMarco on August 24, 2023. Count I of Vello's complaint alleged defamation, while Count II alleged false light invasion of

5

privacy. Vello alleged DeMarco's testimony on March 8, 2023, included false and defamatory statements regarding her advocacy in opposition to Quigley's variance applications and her knowledge and abilities as a lawyer. As a result, Vello alleged she suffered emotional distress and harm to her reputation before the public and the legal community. Vello alleged she and her family were receiving ongoing threats, including threats to her husband, mother, and pet dog. Moreover, Vello maintained there were "vehicles continuously driving by and loitering in front of the Vello home to intimidate [her]." R.R. at 18a.

DeMarco filed his motion for judgment on the pleadings on February 2, 2024, arguing, in relevant part, that he was immune from suit based on high public official immunity, official immunity under the Judicial Code,[1] and judicial or quasi-judicial immunity. Significantly, DeMarco described his testimony at the Board's meeting on March 8, 2023, as a rebuttal to Vello's statements "before the . . . Board and in other public forums, which had impugned the competence of Township employees and the integrity of the Township's zoning enforcement procedures relating to the Bascom and Transvaal parcels." R.R. at 197a. On April 11, 2024, Vello filed a brief opposing DeMarco's motion for judgment on the pleadings.

Common Pleas summarily denied DeMarco's motion by order dated April 18, 2024, and DeMarco timely appealed to this Court. In its opinion filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b), Common Pleas rejected DeMarco's contention that he was entitled to high public official immunity. Common Pleas explained DeMarco's testimony at the March 8, 2023 Board meeting was not a part of his official duties or within his jurisdiction. Common Pleas Op., 6/10/24, at 5. Common Pleas observed the Board is

---

[1] *See* Sections 8545-50 of the Judicial Code, 42 Pa.C.S. §§ 8545-50.

6

independent from the Township commissioners. *Id.* In addition, Common Pleas described DeMarco's testimony as "his personal commentary on the Vellos[, which] did not relate to DeMarco's duties as president of the commissioners."[2] *Id.*

Common Pleas further rejected DeMarco's claim of judicial or quasi-judicial immunity, reasoning it was "questionable" whether the meeting on March 8, 2023, was a quasi-judicial hearing. Common Pleas Op, 6/10/24, at 4. Common Pleas noted Quigley was deceased at the time of the meeting, which resembled a memorial service and "invitation for those present to vilify [the] Vellos," rather than a hearing on Quigley's variance applications. *Id.* Even assuming the meeting qualified as a quasi-judicial hearing, Common Pleas concluded DeMarco's testimony was "little more than a speech designed to call the Vellos liars, to question . . . Vello's status as an attorney, and to accuse the Vellos of causing . . . Quigley's suicide." *Id.* at 5. Common Pleas explained it could not conclude DeMarco's testimony was pertinent and material to the issue of whether variances should have been granted. *Id.*

---

[2] Common Pleas did not separately consider whether DeMarco was entitled to official immunity under the Judicial Code, likely because DeMarco treated official immunity and high public official immunity as a single doctrine in his motion for judgment on the pleadings and concise statement of errors complained of on appeal. *See Feldman v. Hoffman*, 107 A.3d 821, 826 n.8 (Pa. Cmwlth. 2014) (distinguishing official immunity from high public official immunity). DeMarco continued to conflate the two doctrines in his initial appellate brief before apparently abandoning any claim of official immunity in his reply brief. *See* DeMarco's Br. at 42-43; DeMarco's Reply Br. at 7-9. We note DeMarco's initial reliance on official immunity brought this appeal within our appellate jurisdiction under Section 762(a)(7) of the Judicial Code, 42 Pa.C.S. § 762(a)(7), which provides us with authority to decide appeals from final orders in certain "[i]mmunity waiver matters." *See also* Section 702(a) of the Judicial Code, 42 Pa.C.S. § 702(a) ("An appeal authorized by law from an interlocutory order in a matter shall be taken to the appellate court having jurisdiction of final orders in such matter.").

## DISCUSSION

### I. Appealability

We begin by addressing whether this Court has jurisdiction over DeMarco's appeal.[3]  We may hear appeals from only final orders, unless a statute or rule directs otherwise.  *Mahoning Twp. v. Zoning Hearing Bd.*, 320 A.3d 861, 867 (Pa. Cmwlth. 2024).  Generally, a final order "disposes of all claims and of all parties."  *See* Rule 341(b)(1) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 341(b)(1).  At issue in this case is Rule 313 of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 313, which provides for appeals from collateral orders.  This rule applies to any order that is "separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost."  Pa.R.A.P. 313(b).

In *Brooks v. Ewing Cole, Inc.*, 259 A.3d 359 (Pa. 2021), our Supreme Court concluded an order denying summary judgment on sovereign immunity grounds was appealable under Rule 313.  Brooks alleged she suffered injuries "when she walked into an unmarked glass wall while . . . attempting to exit the Family Court building in Philadelphia."  *Id.* at 361.  Brooks filed an action against the Family Court, among other entities.  *Id.*  The Family Court moved for summary judgment under sovereign immunity, contending the Judicial Code's exceptions to sovereign immunity did not apply because it was not a "Commonwealth party."[4]  *Id.*  The court of common pleas denied summary judgment, and the Family Court appealed.  *Id.* at 362.

---

[3] On May 31, 2024, this Court directed the parties to address whether the April 18, 2024 order was appealable in their principal briefs.

[4] *See* Section 8522 of the Judicial Code, 42 Pa.C.S. § 8522.

8

Our Supreme Court concluded the issue of whether the Family Court qualified as a "Commonwealth party" satisfied Rule 313's separability requirement because it was a legal question and there was no need to consider the merits of Brooks' claim. *Brooks*, 259 A.3d at 372. The Supreme Court explained this issue "does not require a court to find any facts regarding the Family Court's alleged negligence nor does it require a court to determine the scope of the Family Court's potential liability." *Id.* The Supreme Court concluded the issue satisfied Rule 313's importance requirement because sovereign immunity "is deeply rooted in public policy, as it is both secured by the Constitution and has been preserved by the legislature." *Id.* at 372. Moreover, the Supreme Court explained the applicability of sovereign immunity to the Family Court had implications beyond that particular case, reasoning the doctrine applies to all branches of government, and "resolution of the scope of sovereign immunity also has implications for other individuals' ability to sue the Commonwealth's courts by invoking an exception to immunity." *Id.*

As a final matter, our Supreme Court concluded the issue satisfied Rule 313's irreparability requirement. *Brooks*, 259 A.3d at 373. The Supreme Court explained the sovereign immunity doctrine "protects government entities from a lawsuit itself." *Id.* Permitting a lawsuit to proceed without appellate review would contravene this purpose by requiring government entities to expend taxpayer dollars and employees' time mounting a defense. *Id.* The Supreme Court reasoned lawsuits would also have a "chilling effect on government policymaking" by exposing those in policymaking positions to litigation. *Id.* Our Supreme Court noted its analysis was consistent with precedent of the United States Supreme Court, holding orders denying immunity are immediately appealable. *Id.* at 373-74 (collecting cases).

9

Our Supreme Court's rationale in *Brooks* applies with equal force in this case. DeMarco's immunity claims satisfy Rule 313's separability requirement because it is unnecessary for us to determine whether DeMarco defamed Vello or invaded her privacy to analyze whether immunity applies. DeMarco's claims satisfy Rule 313's importance requirement because high public official immunity and judicial or quasi-judicial immunity are deeply rooted in public policy. High public official immunity protects "society's interest in the unfettered discussion of public business and in full public knowledge of the facts and conduct of such business." *Doe v. Franklin Cnty.*, 174 A.3d 593, 603 (Pa. 2017) (quoting *Lindner v. Mollan*, 677 A.2d 1194, 1196 (Pa. 1996)). In relevant part, judicial or quasi-judicial immunity "ensure[s] that all issues pertinent to the litigation are aired and explored in a manner that is unfettered by the threat of defamation lawsuits." *Huhta v. State Bd. of Med.*, 706 A.2d 1275, 1276 (Pa. Cmwlth. 1998). These claims may have implications beyond this dispute, given that our holding could be used in other cases involving testimony before zoning hearing boards.

We also conclude these claims satisfy Rule 313's irreparability requirement. As the Supreme Court observed in *Brooks*, immunity doctrines protect the defendant from a lawsuit itself, not merely the damages resulting from a lawsuit. *See* 259 A.3d at 373; *Guarrasi v. Scott*, 25 A.3d 394, 405 n.11 (Pa. Cmwlth. 2011). Contrary to this purpose, permitting a lawsuit to proceed against a person with immunity would expose him or her to "the expense, publicity, and danger of defending the good faith of his public actions before a jury." *Brooks*, 259 A.3d at 373 (quoting *Montgomery v. City of Phila.*, 140 A.2d 100, 103 (Pa. 1958)). Accordingly, the order on appeal is a collateral order under Rule 313, and we may proceed to review DeMarco's issues on the merits.

## II. Judgment on the pleadings

Judgment on the pleadings should be granted "where, on the facts averred, the law says with certainty that no recovery is possible." *Emerich v. Phila. Ctr. for Hum. Dev., Inc.*, 720 A.2d 1032, 1034 n.1 (Pa. 1998). In reviewing Common Pleas' order, we consider "the pleadings and documents properly attached thereto. Accordingly, [we] must accept as true all well[-]pleaded statements of fact, admissions, and any documents properly attached to the pleadings presented by the party against whom the motion is filed, considering only those facts which were specifically admitted." *Foust v. Pa. Dep't of Hum. Servs.*, 305 A.3d 1128, 1132 n.3 (Pa. Cmwlth. 2023) (quoting *Angino & Rovner v. Jeffrey R. Lessin & Assocs.*, 131 A.3d 502, 507 (Pa. Super. 2016)).

### A. High public official immunity

Initially, we consider whether high public official immunity shields DeMarco from Vello's lawsuit. This doctrine "exempts high public officials from lawsuits for defamation provided the statements made by the official are made in the course of her official duties and within the scope of her authority."[5] *Matta v. Burton*, 721 A.2d 1164, 1166 (Pa. Cmwlth. 1998). High public official immunity applies even when the statements at issue were false or motivated by malice. *Id.* Our case law identifies two factors relevant to whether a high public official's statements are immune: "(1) the formality of the forum in which the alleged defamatory words were spoken and (2) the relationship of the legitimate subject of governmental concern to the person

---

[5] To determine whether an individual is a high public official, our courts analyze "the nature of [an official's] duties, the importance of [the] office and particularly whether or not [the official] has policy-making functions." *Doe*, 174 A.3d at 603 n.10 (quoting *Montgomery*, 140 A.2d at 105). Vello concedes DeMarco is a high public official as President of the Township commissioners. Vello's Br. at 33; *see Appel v. Twp. of Warwick*, 828 A.2d 469, 472 (Pa. Cmwlth. 2003) (en banc) (recognizing township supervisor is a high public official).

11

seeking damages for the defamatory utterance." *Azar v. Ferrari*, 898 A.2d 55, 60 (Pa. Cmwlth. 2006).

At this stage of the litigation, in the absence of discovery, we cannot foreclose the possibility that high public official immunity will ultimately bar Vello's lawsuit. Nonetheless, our review is limited to the facts Vello specifically admits. *See Foust*, 305 A.3d at 1132 n.3. Because we conclude the facts averred do not establish with certainty that immunity applies, we affirm Common Pleas' decision. DeMarco argues he testified in a formal forum regarding a legitimate subject of governmental concern. DeMarco's Br. at 45-48. Further, DeMarco insists he was merely rebutting Vello's criticisms of Township employees and zoning enforcement procedures. *Id.* at 46-51. To the extent this testimony rebutted Vello's criticisms of the Township, it did so in only a brief and conclusory manner. Most of the testimony was unrelated to Township employees and procedures and focused on criticizing the Vellos.

DeMarco notes he and the other Township commissioners are responsible for appointing code enforcement officers and members of the Board. DeMarco's Br. at 48. Despite this, DeMarco does not maintain his duties include opining on zoning matters. As Vello retorts, DeMarco has expressly disavowed any involvement in the Board's decision-making process. By letter dated April 2, 2022, DeMarco denied Vello's alleged request for a meeting with the Township commissioners, explaining her zoning dispute with Quigley was "not within the purview" of the commissioners because they have no control over the Board and no influence over its decision. R.R. at 98a.

DeMarco relies on *Hall v. Kiger*, 795 A.2d 497 (Pa. Cmwlth. 2002) (en banc), in which we held high public official immunity applied to a borough councilman. In that case, Hall appeared at a borough council meeting and claimed the borough chief

12

of police "had been charged with raping a young girl many years before." *Id.* at 498. Councilman Kiger investigated the matter and prepared a report, which he presented at a subsequent meeting. *Id.* Councilman Kiger explained Hall's claims "related to a paternity matter for which the [c]hief had accepted responsibility in 1958 when he was eighteen years old." *Id.* Councilman Kiger then made accusations against Hall, alleging he "had been physically abusive to his wife and daughter-in-law, which had prompted family members to seek protection-from-abuse . . . orders." *Id.* This Court explained high public official immunity applied to Councilman Kiger because he made the accusations "in the context of a public meeting while . . . performing his duty as councilman to report on a matter of great public concern that had been initiated by the subject of the defamatory comments." *Hall*, 795 A.2d at 501.

In contrast to *Hall*, DeMarco's testimony on March 8, 2023, did not occur at a commissioners' meeting, did not respond to any issues or disputes pending before the commissioners, and may not have related to activities within the commissioners' powers. Although Vello had allegedly tried to involve the Township commissioners in her zoning dispute, DeMarco did not provide his testimony in that forum. Rather, he sought out a forum distinct from the commissioners and spoke regarding a matter over which he acknowledged no control and had previously refused to participate. Accordingly, without further factual development clarifying the scope of DeMarco's duties and establishing that those duties would reasonably involve speaking at Board meetings and opining on cases before the Board, we agree with Common Pleas that DeMarco is not entitled to high public official immunity.

## B. Quasi-judicial immunity

We next discuss DeMarco's claim of judicial or quasi-judicial immunity. The doctrine of judicial immunity provides that "[s]tatements made in pleadings, as well

13

as in the actual trial or argument of a case, are absolutely privileged, and the maker of the statements is immune from legal action as long as the statements are pertinent and material to the litigation." *Huhta*, 706 A.2d at 1276. Judicial immunity applies to judges, attorneys, parties, and witnesses. *Id.* In addition, the doctrine is absolute, meaning "the declarant's intent is immaterial even if the statement is false and made with malice." *Schanne v. Addis*, 121 A.3d 942, 947 (Pa. 2015). Vello acknowledges this immunity applies to both judicial and quasi-judicial proceedings, which includes proceedings before zoning hearing boards. Vello's Br. at 44 (citing *Doe v. Wyoming Valley Health Care Sys.*, 987 A.2d 758, 766-67 (Pa. Super. 2009)).

The facts averred do not establish with certainty that the Board's meeting on March 8, 2023, was a quasi-judicial proceeding. Vello argues the meeting was not quasi-judicial because Quigley was deceased and the proceeding "was in the nature of a memorial service," rather than an evidentiary hearing. Vello's Br. at 45-47. She cites to case law declaring that "[a] dead man cannot be a party to an action and any such attempted proceeding is completely void and of no effect." *Id.* at 45 (quoting *Thompson v. Peck*, 181 A. 597, 598 (Pa. 1935)) (emphasis omitted). This argument may have merit, particularly given Howey's recognition near the end of the meeting that Quigley's variance applications were not being discussed, and "[a]ctually, we're paying homage to . . . Quigley and his family." R.R. at 412a. Without further factual development establishing the nature and purpose of the Board's meeting, we agree with Common Pleas that DeMarco is not entitled to quasi-judicial immunity.

Even accepting for the sake of argument that DeMarco's testimony occurred during a quasi-judicial proceeding, it is unclear whether the testimony was pertinent and material to the litigation. DeMarco maintains his testimony rebutted Vello's criticisms of Township employees and zoning enforcement procedures. DeMarco's

14

Br. at 58-62. Once again, however, to the extent DeMarco's testimony responded to Vello's criticisms of the Township, it did so in only a brief and conclusory manner. Most of the testimony did not include discussion relevant to the variance applications and rather focused on criticizing the Vellos.

We are mindful quasi-judicial immunity should not apply in situations where it does not implicate the doctrine's underlying policy goals, which include permitting free discussion of legal claims. *Schanne*, 121 A.3d at 947-48. Our focus is whether the doctrine "would promote the efficient administration of justice." *Id.* at 949 n.4. Granting DeMarco quasi-judicial immunity in these circumstances would arguably detract from the administration of justice by allowing the Board's public meeting to be used as a venue for personal attacks. This is particularly true because DeMarco did not testify subject to cross-examination but provided a speech in response to the Board's invitation for comment. Tellingly, DeMarco's testimony did not facilitate resolution of Quigley's variance applications but contributed to the meeting breaking down into disorder.

## CONCLUSION

Because Common Pleas' April 18, 2024 order is an appealable collateral order under Rule 313, we have jurisdiction to reach the merits of DeMarco's appeal. In reaching the merits, however, we conclude further factual development is necessary to determine whether DeMarco is entitled to high public official immunity and quasi-judicial immunity. Therefore, we affirm the April 18, 2024 order without prejudice to DeMarco's right to raise the doctrines of high public official immunity and quasi-judicial immunity again at a later stage in the proceedings.

_____
STACY WALLACE, Judge

15

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kathleen G. Sheehan Vello       :
      :
     v.       : No. 526 C.D. 2024
      :
Daniel DeMarco,       :
           Appellant   :

## **O R D E R**

**AND NOW**, this 10th day of July 2025, the order of the Court of Common Pleas of Allegheny County dated April 18, 2024, is **AFFIRMED** without prejudice to Daniel DeMarco's right to raise the doctrines of high public official immunity and quasi-judicial immunity again at a later stage in the proceedings.

_____
STACY WALLACE, Judge